IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| LARRY WALKER and CYNTHIA WALKER )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>LOUISVILLE LADDER, INC., )<br>)<br>Defendant. )<br>)<br>) | Civil Action No. 3:07-CV-377<br>JUDGE VARLAN<br>Magistrate Shirley |

## MEMORANDUM IN SUPPORT OF LOUISVILLE LADDER'S MOTION TO EXCLUDE OPINION TESTIMONY

Louisville Ladder submits this memorandum in support of its motion to exclude proposed opinion testimony by plaintiff's engineering witness that fails to meet the admissibility criteria of Fed. R. Evid. 702.

### SUMMARY OF ARGUMENT

The target testimony is Stanley Kiska's proposed "explanation" of Larry Walker's fall from a six-foot stepladder. Kiska's opinion and demonstrative video should be excluded because he assumes facts contrary to the testimony of Mr. Walker and employs these assumptions to "re-create" an accident different from the event described by Mr. Walker. When a Rule 702 witness does not employ sufficient facts or a reliable methodology to support an accident theory, the theory is not admissible. Substantial similarity of conditions—opinion testimony fitting the facts of the case—is a threshold requirement for admissibility. *United States v. Gaskel*, 985 F.2d 1056, 1060 (11th Cir. 1993); *United States v. Birch*, 39 F.3d 1089, 1092 (10th Cir. 1994).

Kiska proposes to illustrate his opinion of how the accident occurred with a video of his use of an exemplar ladder, but any demonstration of a purported event is excludable if it is not consistent with the testimony of witnesses with first-hand knowledge.[1] *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1402 (8th Cir. 1994). *See also Fusco v. General Motors Corp.*, 11 F.3d 259, 264 (1st Cir. 1993).

### DESCRIPTION OF THE ACCIDENT

Larry Walker was working as a custodian at Wartburg High School when Jessica Hudgins, a young teacher in the alternative education program, asked him to check for contraband above the tile ceiling in a boys' restroom:

> Well, Jessica come and told me she thought some of the kids had tobacco or dope or something hid in the ceiling. There was too much activity going on in the bathroom. She asked me if I would come up there and look and see. I told her, yea, I said now that they are down there at the lunch room eating lunch and nobody in there. I said you will be there, ain't you. She said yeah. So I just got the ladder and we walked up the hall together.

See *Exhibit A*, Larry Walker deposition excerpts, at 70.

Although Mr. Walker set out to perform the task Ms. Hudgins requested, his lifelong fear of heights and trepidation using ladders shaped his actions. Even as a child, Mr. Walker avoided climbing trees because he was afraid of being off the ground. (*Id.*, Walker dep. at 37-38.) As high school custodian, Mr. Walker refused to climb a six-foot wood stepladder furnished for his use: "I told them I wasn't climbing that. I mean it was rickety and shaky." (*Id.*, Walker dep. at 41-42.) After a year or two, Mr. Walker finally received permission to buy a new stepladder—the aluminum, six-foot, light duty ladder

---

[1] Because Kiska's video cannot be filed with the court via ECF, Louisville Ladder mailed a DVD to the Clerk of Court concurrent with filing this document. Louisville Ladder requests that the DVD be attached to this memorandum as *Exhibit C*.

being used at the time of the accident. (*Id*., at 53.) He used the new stepladder only two or three times before the use in question. (*Id.,* at 65).

With Ms. Hudgins holding open the door to the boys' restroom, Mr. Walker set up the stepladder by making sure it was locked and that all four feet were firmly on the floor. (*Id*., at 97-98). He climbed slowly—placing both feet on each step before going to the next one up—never swaying his body and never doing anything that would lift the ladder's feet off the floor. (*Id.,* at 101-02.) Mr. Walker carefully moved one of the ceiling tiles to gain access to the suspect area. (*Id*., at 99-100.) With a flashlight in his left hand, Mr. Walker scanned above the ceiling tile while keeping his body movement to a minimum: "I just turned my head. I didn't move." (*Id*., at 82, 104.) At the moment of accident, his right hand was "holding against the wall" to his right and his left hand was holding the light. (*Id*., at 104.) In Mr. Walker's words:

> I was just fixing to start down, and I felt the ladder move. I thought oh Lord this is going to be bad. I reached to try to put my hand on top of it where I could get down. It was just like that made it get faster. And then I remember it slamming me back against the wall. And then when I hit the floor, I don't know how long I was out. But when I come to Jessica was still standing there holding the door open. (*Id.,* at 70-71)

### OPINION TO BE EXCLUDED

Stanley Kiska does not believe that *any* six-foot tall, four-legged stepladder—whether heavy-duty or light duty, whether made of aluminum, fiberglass or wood—is reasonably safe for its intended use. (*Exhibit B*, Stanley Kiska deposition excerpts, at 84.)[2] Mr. Kiska's opinion, expressed in every stepladder case in which he has testified in

---

[2] Stanley Kiska was deposed on November 17, 2008. The only available transcript of that testimony at this early date is deemed by the court reporter an uncertified "rough draft" that may contain key stroke errors, mistranslations, and reporter's notes. Obvious errors of this kind are corrected in the quotations.

3

the past five years, is that all six foot tall, four-legged stepladders can "inadvertently walk" during use and, as a result, are unreasonably dangerous. (Kiska dep. 45.) "Walking" is defined by Kiska as one foot of the stepladder coming off the ground, as a result of activity by the user, causing an out-of-balance three-point stance. (*Id*., Kiska dep. 161-62.). Kiska is not aware of any other engineer or scientist publishing confirming data consistent with his "induced walking" theory. (*Id*., at 127)

Kiska contends in this case that Mr. Walker's body movement on the stepladder made the ladder inadvertently "walk," bringing one foot off the floor and causing the instability that led to his fall. (*Id*. at 43.) Kiska testified that it is merely "helpful," not necessary, to know what Mr. Walker was doing with his feet, hands, and body that could cause inadvertent walking. (*Id*., at 34-35.) Pressed to identify "exactly what movement of Mr. Walker's body or any part of body" caused the stepladder to move from a four point to a three-point stance, Kiska testified "it was a result of his shifting his weight." (*Id.,* at 160-61.)

The crux of Kiska's unsupportable and inadmissible opinion is reflected in the following deposition excerpts, all of which are attached as part of *Exhibit B* and illustrated by the video submitted *as Exhibit C*:

> Q. What specifically did he do, besides—you call it shifting his weight. What did he do with his body?
>
> A. With the understanding obviously that I was not there at the time, but based upon my understanding of the performance capabilities and inabilities of this product, I know that shifting one's weight on the ladder without physically moving your feet off a step can cause the ladder to go from a four point to a three point contact.
>
> Q. You have videotaped yourself making that movement on a six foot stepladder, correct?

4

A. I have.

Q. And it is your contention to the ladies and gentlemen of the Jury that what they see you doing in that video is what you contend Mr. Walker did as he was shifting his weight on the accident ladder?

A. Or something somewhat similar, yes. [*Id.,* at 161-62]

* * * *

Q. Mr. Walker testified under oath that he didn't move his body just turned his head, is that what your videotape shows?

A. It says he didn't move. I think the question isn't asked very specifically. He is not saying, you asked him about his feet and I believe he said his feet remained still. So we don't know that he didn't shift his weight. It doesn't say that he didn't shift his weight.

Q. It does say he didn't move?

A. That's right. [*Id.*, at 164-65]

* * * *

Q. Is that what you did in the video, you moved your body until you could get the ladder to move underneath your feet? Is that correct?

A. That is what happened. I moved my body and the ladder shifted.

Q. Tell us where in Mr. Walker's sworn testimony that he describes performing the movement that you portray on the video?

A. I don't know that it is in here.

Q. There isn't in Mr. Walker's sworn description of the accident a description of body movement that corresponds with what you have in your video, is there?

A. You don't go into that kind of detail. [*Id.,* at 165-66]

* * * *

Q. There isn't any description in Mr. Walker's sworn

testimony of the movement of his body that corresponds
with what you portray in the video. Isn't that true?

A. Not in that specific regard, no. [*Id.,* at 166]

* * * *

Q. Do you have any evidence that Mr. Walker, a man
afraid of ladders, afraid of climbing ladders, on this ladder
only reluctantly, who climbed the ladder one step at a time,
got to the point where he was looking up in the ceiling and
did with his body what you are shown doing in your
videotape? Do you have any evidence that he did that?

A. I don't feel that there is any evidence that he didn't.

Q. That is not my question. Do you have evidence that he
did do what you depict in the video based upon his
description of the work?

A. There is no specific question and response in here to
indicate that he shifted his weight. [*Id.*, at 167-68]

## LEGAL ARGUMENT

The admissibility of opinion testimony is governed by Federal Rule of Evidence 702. The rule allows for "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." A witness may express opinions if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.*

As the evidentiary gatekeeper, this court should exclude Kiska's proposed testimony because it fails all three prongs of Rule 702: his testimony does not rely on the facts presented, he does not use a reliable method, and he does not apply his method reliably. See *Daubert v. Merrell Dow Pharmaceuticals*, 509 US. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (applying the gatekeeper function to all forms of expert testimony). The rationale underlying the court's gatekeeping function

6

applies to Kiska because his opinions, like those of most Rule 702 witnesses, "have the potential to be both powerful and quite misleading." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (*quoting Daubert*, 509 U.S. at 595).

### 1. Kiska's "inadvertent walking" theory is not based on the facts.

For Kiska's accident theory to be admissible, his explanation must account for Mr. Walker's credible testimony describing why and how he minimized his movements on the ladder. *Robinson v. G. D. Searle & Co.*, 286 F.Supp. 2d 1216, 1222 (N.D. Cal. 2003). Mr. Walker's slow and careful climb is consistent with his fear of heights and distrust of "shaky" ladders. He steadfastly denies that there was any movement of the ladder as he climbed it and, even while surveying the area above the tile ceiling, Mr. Walker made a point of not moving his body.

Kiska's theory discounts Mr. Walker's description of what he did with the ladder. When questioned about whether a man afraid of heights would "shift" his weight on the ladder sufficient to "cause the ladder to go from a four point to a three point contact," Kiska responded evasively: "I don't feel that there is any evidence that he didn't." Kiska was forced to admit the absence of testimony supporting his theory: "There is no specific question and response in here to indicate that he shifted his weight."

Moving from what Mr. Walker didn't say to what he did, Kiska simply ignores portions of Mr. Walker's description. For example, at the onset of his fall, Mr. Walker testified that his right hand was "holding against the wall" and his left hand was grasping the flashlight. Mr. Walker was explicit about the consequence of moving his hand away from the wall: "I reached to try to put my hand on top of it where I could get down. It was just like that made it get faster." Although inadvertently pushing away from the wall could be an obvious explanation for tipping the stepladder, Kiska would not accept this

7

possibility.  Failing to account for alternative causes of an event is a hallmark of unreliability.  *Reiff v. Convergent Tech*, 957 F.Supp. 573, 583 (D.N.J. 1997).  Yet, so that his explanation would work, Kiska had to "discount [Walker's] testimony that he was pulling his hand from the wall when he first felt the ladder move."  (Kiska dep. at 180.)

Reliable investigation does not proceed by discounting facts at odds with a pre-selected theory.  Scientific inquiry requires identifying all reasonable explanations for an observed phenomenon and systematically testing each explanation for validity.  This process is known as "falsification."  *See* 70 *Reference Manual on Scientific Evidence* (2nd Ed. 2000), "How Science Works" (Goldstein), citing Popper, *The Logic of Scientific Discovery* (1959).  Reliable testimony is grounded in the methods and procedures of science:  a Rule 26 witness cannot rely on mere subjective belief or unsupported speculation.  Under the *Daubert* standard, unless another qualified witness could use the same facts and employ the same methodology to generate the same conclusions, the proponent's opinions are not sufficiently reliable to warrant admission of evidence.  *Daubert*, *supra*, at 591-92; *Kumho, supra*, at 147; *Nelson v. Tennessee Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001); *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000).

**2.  Kiska's "inadvertent walking" theory is not a reliable methodology.**

Kiska's theory of stepladder dangers caused by "inadvertent walking"—indeed, his condemnation of all four-legged stepladders due to this supposed propensity—is based on one event in his personal life.

Mr. Kiska spent fifteen years working as an engineer for Werner, one of the largest ladder companies in the United States. (*Id.,* at 79.)   He testified between 50 to 75 times in product liability cases on Werner's behalf (*id.,* at 46), with the largest fraction of cases involving Werner's model 356, a six-foot, light duty, aluminum stepladder similar

8

to the ladder Mr. Walker was using. (*Id*., at 49-50.) He testified "dozens of times" that the model 356 was free of defects and safe for ordinary use. (*Id.* at 84). As a Werner engineer, Kiska tested the Werner 356 an estimated "200 times." (*Id.*, at 159.)

Yet, according to Kiska, about a year after losing his job at Werner he experienced an epiphany "of sorts" while using his personal stepladder in his garage:

> I have a storage area in the area above the rafters in my garage and I was putting something up there and I had a box or something and I had already placed it and I was in the process of repositioning it to make sure it wouldn't fall off the plank I had above and it was in the process of doing that that happened, this event happened.
>
> Q. This momentary movement of the ladder you were standing on?
>
> A. The walking out from under me, yes. (*Id.,* at 84-86.)

This "walking-out-from-under-me" event is the genesis for Kiska's assertion that every six-foot tall, four-legged stepladder—no matter what duty rating and no matter whether made of aluminum, fiberglass or wood—is unsafe. (*Id.,* at 45.)

Aside from the frank incredibility of "discovering" a ubiquitous ladder defect shortly after losing his job as a ladder engineer, Kiska's condemnation of every conventional six-foot stepladder raises obvious doubts about the reliability of his methodology. Kiska's approach is based on a unique test, developed and used only by him, called the "induced walking" test. (*Id.*, at 86-87.) The details of Kiska's testing protocol are not found in any published document or standard, and no other engineer in the field of ladder safety uses the test that Kiska devised. (*Id.,* at 89.)

Moreover, Kiska contends that three-legged stepladders, commonly called "tripod" or "orchard ladders," are the cure for the tipping propensity that supposedly plagues all conventional four-legged ladders; but, Kiska has never performed any

9

American National Standard test on a three-legged stepladder nor has he reviewed such testing performed by others. (Id., at 106-07.)

These facts raise an important question: Is Kiska proposing to testify about matters growing naturally and directly out of legitimate research or did he develop his theory expressly for the purposes of testifying in litigation? The fact that Kiska's testing protocol is unique—used solely by him—directly contradicts the peer review expectation set forth in *Daubert* as a factor for assessing the admissibility of expert evidence. In *Johnson v. Manitowoc Boom Trucks*, 484 F.3d 426 (6th Cir. 2007), the Sixth Circuit reviewed and approved using the "prepared-solely-for-litigation" factor to assay the admissibility of engineering testimony. Reviewing the trial court's exclusion of engineering testimony in a case arising in the District Court of the Middle District of Tennessee, the Sixth Circuit held that the trial court has the discretion to conduct a *Daubert* analysis with greater rigor if the proposed opinion was formulated solely for the purposes of litigation. *Id.* at 435. Objective evidence of reliability is present when a proposed expert's opinion arises out of the normal course of pursuing professional research, field work, or other non-litigation activity. *Id.* When, however, as here, a witness proposes to explain an accident using a theory he personally discovered, employing a test that he personally developed, objective evidence of reliability is absent.

A witness expressing technical opinions must show intellectual rigor in the development and testing of proposed scientific explanations. In *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 687 (8th Cir. 2001), the Eighth Circuit concluded that *Daubert's* progeny provide ample support for analyzing admissibility based on "whether the expertise was developed for litigation or naturally flowed from the expert's research."

*See also, Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316 (7th Cir. 1996) (experts in court must adhere to the same standards of intellectual rigor that are demanded in their professional work); *Watkins v. Telsmith, Inc.*, 121 F.3d 984 (5th Cir. 1997) (proper to evaluate whether the expert is a "hired gun").

Moreover, Kiska's method simply does not pass scientific muster. "An expert scientific opinion must be grounded in the 'methods and procedures of science,' and must consist of more than simply 'subjective belief or unsupported speculation.'" *Cummins v. Lyle Industries*, 93 F.3d 362, 368 (7th Cir. 1996). A key factor is whether a supposed expert's opinion has been subjected to the scientific testing. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert*, 509 U. S. at 2796. Scientific testing, it almost goes without saying, is not satisfied by unique testing protocols employed by only one person.

In the end, Kiska's personal experience and his one-of-a-kind test are not a substitute for sound methodology, so his explanation of the accident is not admissible. *Hayes v. Ratheon Co.,* 808 F.Supp. 1326, 1331 (N.D. Ill. 1992); *Moore v. Ashland Chemical Inc.,* 151 F.3d 269 (5th Cir. 1998). Kiska's views are merely inadmissible personal opinion, not scientific evidence grounded in a reliable method. *Thomas v. FAG Bearings Corp.*, 846 F.Supp. 1382, 1393 (W.D. Mo. 1994).

### 3. Kiska's "inadvertent walking" theory is not reliably employed.

Even if Kiska did not assume facts contrary to Mr. Walker's testimony and discount what Mr. Walker described, and even if Kiska could validate his sketchy methods, his shoe-horning of Mr. Walker's accident into a pre-existing "inadvertent walking" theory does not satisfy the third prong of Rule 702.

Kiska deployed his pre-packaged ladder defect theory in this case—as in others—despite the facts and circumstances of Mr. Walker's accident. Kiska testified that it is merely "helpful," not necessary, to know what Mr. Walker was doing with his feet, hands, and body that could cause inadvertent walking. When pressed to acknowledge that he could not furnish an engineering explanation of a ladder accident "without knowing something about what the user was doing," Kiska answered: "I think it depends upon the circumstances." (*Id.,* at 36.) Kiska eventually admitted that he "may have" rendered opinions about what happened in a ladder accident without knowing anything about what the user was doing on the ladder. *(Id.)*

Rendering opinions without facts is not science. Kiska's explanation of Mr. Walker's accident pre-dated and was derived independent of the facts of this case. Kiska's method is to simply look for information that might support his preferred explanation and discount everything else.

An opinion witness cannot rely merely on his "subjective belief or unsupported speculation." *See Nelson*, *supra*, at 250. If a witness claims that a reenactment video shows the accident mechanism, he bears the burden of establishing substantial similarity of conditions. *United States v. Gaskel*, *supra*, at 1060. When eyewitnesses to an event provide factual details in sworn testimony, an explanation of the scientific underpinnings of that event must be consistent with those with first-hand knowledge. *McKnight, supra*; *Fusco, supra*.

Objective examination of Stanley Kiska's opinion testimony and demonstrative video (see *Exhibit C*), reveals that Larry Walker's account of the accident does not

12

support Kiska's video.  Kiska's theory is advanced here to "explain" Mr. Walker's fall even though the theory does not fit the facts.

## CONCLUSION

Stanley Kiska's opportunistic explanation of Larry Walker's accident does not meet the admissibility criteria of Fed. R. Evid. 702, and the testimony and video should be excluded.

> John L. Tate (*pro hac vice*)
> STITES & HARBISON, PLLC
> 400 West Market Street
> Suite 1800
> Louisville, KY 40202-3352
> Telephone: (502) 587-3400
>
>
> s/Lauren Paxton Roberts
> Lauren Paxton Roberts
> STITES & HARBISON, PLLC
> 401 Commerce Street
> Suite 800
> Nashville, TN  37219-2376
> Telephone:  (615) 244-5200
>
> *Counsel for Louisville Ladder, Inc*.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 24th day of November, 2008, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the court's electronic filing system to all parties listed below. Parties may access this filing through the Court's electronic filing system.

| | |
|---|---|
| W. Holt Smith | J. Timothy Bobo |
| 209 Tellico Street | Ridenour & Ridenour |
| Madisonville, TN 37354 | P.O. Box 530 |
| | Clinton, TN 37717 |

                                  s/Lauren Paxton Roberts
                                  Lauren Paxton Roberts

799820:1:NASHVILLE