# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

**LARRY L. WALKER and wife,**
**CYNTHIA WALKER**

 **Plaintiffs**

**v.**          **NO. 3:07-CV-00377**
             **JURY TRIAL DEMANDED**

**LOUISVILLE LADDER, INC.,**

 **Defendant**

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE OPINION TESTIMONY

Come the Plaintiffs, Larry Walker and Cynthia Walker, and file this

Memorandum in Support of Response to Defendant's Motion to Exclude Opinion

Testimony:

## I.   THE PRODUCT

The product involved in this case is a six (6) foot aluminum step ladder

manufactured by Louisville Ladder, Inc. (hereinafter LLI) and sold under the

Davidson brand name with a model designation of D-2316-06S (hereinafter the

ladder). The ladder is in some respects typical of all stepladders. It has an A-frame appearance with front rails and rear legs. The front rails are connected with the steps, which are the portion of the ladder designed for climbing by the consumer. As is the case for most stepladders, the rear legs are connected by horizontal braces which are not designed for climbing. In addition, the ladder has spreaders located approximately midway between the top and bottom, which allow the ladder to be opened and locked into an "A-frame" orientation for use, or folded for more convenient storage. (Exhibit A, Affidavit Kiska paragraph 3).

The risk of harm at issue here is the tendency of the ladder to "walk." "Walking" is the process by which a four legged ladder begins to flex and twist in response to uneven loading, ultimately resulting in the legs of one side shifting (typically forward) relative to their initial position. This twisting and shifting can result in the ladder transitioning from a position of four-leg contact with the ground to three-leg contact with the ground. Subsequent movements can cause further shifting and twisting of the ladder, causing various legs of the ladder to alternately be lifted off the ground and reset, all the while advancing a ladder forward (or backward) as if mimicking a walking motion. This twisting of the ladder can result in a lateral shift of the rear section relative to the front section, commonly referred to as racking. This phenomenon can manifest itself inadvertently, without the user's knowledge as the result of reasonably

foreseeable actions on the part of the user while climbing or working from the ladder. This unintentional racking or walking may occur despite the consumer using the ladder in a manner in compliance with the warning/instruction labels which accompany the ladder. (Affidavit Kiska paragraph 4).

This phenomenon has been recognized by the ladder industry for more than twenty-five years. The rationale for the ANSI racking tests published in 1983 acknowledges the undesirable nature of excessive walking or racking. (Exhibit C, ANSI Rationale). This statement was based in part on the work performed for the CPSC in 1977 at Case Western Reserve and contained in the "Fox" Report. "Our opinion is that an increase in ladder racking stiffness will turn out to be the major factor in improving step ladder tipover safety. It would cut down on 'walking' tendency and keep the ladder base squarely centered under the ladder." (Exhibit D, Fox Report).

Although the ladder in this case is similar in design to most other aluminum stepladders it does contain a very significant design difference. While the ANSI standards specify a minimum step depth (front-to-back) of three inches there are no such specifications for the width of the side rails. Most manufacturers of conventional stepladders, however, utilize front side rails of 3 inches to fully house the steps. That is, most stepladders have the same width front rail as the step. However, the product which injured Larry Walker does not.

3

In an effort to comply with the letter of the standard, yet still cut costs to an extreme, the ladder in question uses a 3-inch step, but the size of its side rails has been reduced to far less than three inches. In fact, in 2003 LLI <u>further reduced</u> the width of the front rail, which was already less than three inches. This significant reduction affects the ladder's ability to resist twisting and inadvertent walking. (Affidavit Kiska paragraph 8; Exhibit E, LLI's Responses to Request for Production).

Thus, despite the knowledge of the importance of building a stiffer, less flexible stepladder to resist excessive twisting, LLI built the ladder here with an extremely narrow side rail adding to its flimsiness. Mr. Kiska, after testing an exemplar model D-2316-06S, concluded this model stepladder is the flimsiest of any conventional 6-foot aluminum step ladder he had ever tested, thus increasing its susceptibility to unintentional walking and increasing the risk of tipover, and injury to the consumer. (Affidavit Kiska paragraph 8).

## II.    MR. KISKA'S PROPOSED TESTIMONY MEETS DAUBERT'S AND F.R.E. 702 REQUIREMENTS

Expert testimony need not be generally accepted to be admissible; it need only be relevant (the testimony should fit the facts of the case) and it should be reliable (the testimony is the product of reliable principles and methods and the

witness has applied the principles and methods reliably to the facts of the case). *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993); **F.R.E.** 702. Mr. Kiska's proposed testimony meets these criteria.

The issue before the Court is whether the evidence of Mr. Kiska's climbing demonstration, his testimony concerning the cause of Mr. Walker's injury and his tests performed to illustrate the principles behind the "unintentional walking" phenomenon will assist the trier or fact. There is no dispute Mr. Kiska is qualified by knowledge, skill, experience, training or education to render helpful testimony. **F.R.E.** 702.

Mr. Kiska is a Licensed Professional Engineer. He has a Bachelor of Science in Mechanical Engineering. From 1985 he was employed by Werner Company where he was responsible for new product development, as well as redesign of existing Werner products. His work at Werner involved the analysis, design and redesign of climbing products including aluminum stepladders similar to the ladder. While at Werner he directed the activities of draftsmen, test engineers, and supervised the testing of products using tests similar to the test he is using here. A substantial portion of his work at Werner Ladder Company was the investigation of ladder accidents. He investigated hundreds of accidents involving climbing products and in each case arrived at and rendered an opinion, often in Court, as to the cause of the accident. His testimony as a ladder engineer

and as to the cause of a ladder accident has never been rejected by any Court. (Affidavit Kiska paragraphs 1, 2, 3).

When appearing in the Courtroom the expert is required to use the same methods and same level of intellectual rigor that characterizes the practice of an expert in a relevant field. *Kumho Tire Co., Ltd. v. Carmichael*, 119 S.Ct. 1167, at 1176 (1999). That is the testimony must be based upon sufficient facts or data. **F.R.E.** 702.

In this case Mr. Kiska has reviewed disclosures by LLI, the depositions, examined the subject ladder, gone to the scene with Mr. Walker, set the ladder up in the same location, climbed the ladder in accordance with Mr. Walker's depositions and instructions at the scene, performed objective tests on an identical model ladder, performed tests on a similar model ladder of another manufacturer, and compared all the test results with previous test results he has performed on other model ladders. He has produced a video of all these tests and the climbing demonstration for LLI's inspection. He has prepared an eleven page report and two supplemental reports which have been provided to LLI. The methods he used and the intellectual rigor he has employed in this case are the same as those that characterize the practice of a ladder expert in the field of ladder engineering. (Affidavit Kiska; Attached Reports October 17, 2008; October 24, 2008; December 3, 2008).

## III.   THE ISSUE CONCERNING THE VIDEOTAPE OF CLIMBING DEMONSTRATION AND THE TESTS MR. KISKA PERFORMED.

Mr. Kiska's testimony concerning the climbing demonstration is the product of reliable principles and methods. **F.R.E.** 702.  Mr. Kiska, to illustrate the principles of his testimony to the jury, has prepared a climbing demonstration. This climbing demonstration is based upon the facts and data he has gathered and applied in this case using the same methods and same level of "intellectual rigor" he used while working for Werner Ladder Company. *Kumho Tire*, at 1176. Whether LLI disagrees that the climbing demonstration illustrates the principles of "unintended walking" is not the issue.  The "focus, of course, must be solely on principles and methodology, not the conclusions they generate." *Daubert*, at S.Ct. 2797.  Proponents of expert testimony "do not have to demonstrate to the Judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In Re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, at 744 (3rd Cir. 1994).  Furthermore, when facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts.  The term "sufficient fact or data" is not intended to authorize a Trial Court to exclude an

7

expert's testimony on the grounds that the Court believes one version of facts and not the other. Comment to **F.R.E.** Rule 702, 2000 Amendments.

Mr. Kiska prepared a climbing demonstration which is meant to recreate a scenario similar to the conditions described by Mr. Walker at the time of the injury. He also has performed and videotaped tests on similar model ladders to illustrate the principle of "unintentional walking" and to quantify the degree of this phenomenon in the model ladder in question and compare those findings to other ladders. The issue for the Court is whether in preparing these experiments and tests Mr. Kiska used reliable principles and methods. **F.R.E.** 702. (Affidavit Kiska paragraphs 7, 8) (Attached to Response are Exhibit G which is the climbing demonstration and Exhibit H which is a video of the tests performed).

▪ **Climbing demonstration**

Mr. Kiska went to the scene and set up the ladder consistent with Mr. Walker's description in his depositions. He placed the ladder where Mr. Walker says it was. He climbed the ladder and kept his feet in place and recreated "unintentional walking" with an identical model.

The purpose of the video containing the climbing demonstration is:

1. To substantially recreate a scenario similar to the conditions described by Mr. Walker and to illustrate that under those conditions the same model ladder will walk or rack;

2. To illustrate the principles of walking or racking; and

3. To refute the Defendant's contention that the tipover of the ladder was the result of Mr. Walker's pushing off the wall. (Affidavit Kiska paragraph 9).

The issue concerning the climbing demonstration is one concerning the admissibility of an experiment or demonstration. **F.R.E.** 401.  As long as the experiment, demonstration or test is made under similar circumstances to those existing in the case at issue the evidence should be admitted, with the question of any discrepancies between the demonstration and the actual events being not an issue of admissibility but credibility an assessment assigned exclusively to the discretion of the jury. *Persian Galleries, Inc. v. Transcontinental Ins. Co.*, 38 F.3d 253 (6th Cir. 1994) (Appeal to Sixth Circuit from Eastern District of Tennessee from ruling of then Magistrate Judge Phillips to allow the admission of the recreation of a burglary, when the time required to commit the burglary was a critical issue); *Accord; Crown Cork & Seal Company v. Morton Pharmaceuticals, Inc.*, 417 F.2d 921 (6th Cir. 1969); *Champeau v. Fruehauf Corporation*, 814 F.2d 1271 (8th Cir. 1987); *Pandit v. American Honda Motor Co.*, 82 F.3d 376 (10th Cir.

9

1996); *Randall v. Warnaco, Inc.*, 677 F.2d 1226 (8th Cir. 1982); *Kehn v. Proctor & Gamble*, 724 F.2d 613 (8th Cir. 1983); *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408 (3rd Cir. 2002).

In *Persian Galleries*, the District Court, through United States Magistrate Judge Thomas W. Phillips, admitted a videotaped reenactment of a burglary. The business owner, Persian Galleries, had made a claim for the loss of 27 oriental rugs as a result of a burglary under its "all risk" insurance policy. Transcontinental defended in part on the basis that no burglary could have occurred because of motion detectors that would have activated in the store. Over Transcontinental's objection Persian Galleries introduced a videotape experiment showing the window glass in the entry door being broken out and four individuals removing 24 rugs in one minute and thirty-five seconds. Transcontinental objected stating the video did not accurately depict the incident whereby the rugs were lost or removed. The District Court allowed the videotape reenactment of the burglary and an appeal followed.

On appeal the Sixth Circuit noted that it reviewed the admission of this evidence on an abuse of discretion standard. The Sixth Circuit held that as long as the experimental evidence shown in the videotape was conducted under conditions substantially similar to the actual conditions it should be admitted.

> "A court may properly admit experimental evidence if the tests were
> conducted under conditions substantially similar to the actual

conditions. Admissibility, however, does not depend on perfect identity between actual and experimental conditions. Ordinarily, dissimilarities affect the weight of the evidence, not its admissibility." *Randall v. Warnaco, Inc.*, 677 F.2d 1226, 1233-34 (8th Cir. 1982) (citations omitted). *Id,* at 258.

On appeal Transcontinental made the argument it was error to admit the videotape because the reconstructed scene did not reflect the conditions as they existed at the time of the burglary. The District Court and the Sixth Circuit noted the purpose of the videotape was to demonstrate that the theft of the rugs could have been completed within the time interval that elapsed between the activation of the alarm system and the arrival of the first officer. The alleged discrepancies between the reconstructed crime site and the conditions as they may have existed on the night of the theft "reflect, not upon the admissibility of the evidence, but rather upon its credibility, an assessment assigned exclusively to the discretion of the jury." Id. *Accord, Champeau v. Fruehauf Corporation*, 814 F.2d 1271 (8th Cir. 1987); *Crown Cork & Seal Company v. Morton Pharmaceuticals, Inc.*, 417 F.2d 921 (6th Cir. 1969).

Here, Mr. Kiska, with Mr. Walker's supervision, placed the ladder in the same manner and location where the injury occurred. As Mr. Walker did on the day of the injury, Mr. Kiska:

- Made sure the ladder was fully opened and the spreaders were locked;

- Set all four feet on a firm level surface;

- Made sure the spreaders were locked and ladder was stable before climbing;

- Faced the ladder as he climbed, using both hands to maintain a firm grip;

- Kept his body centered between the side rails;

- Did not overreach;

- Did not climb higher than permitted;

- Was not pushing or pulling off to the side of the ladder; and

- Did not intentionally walk or shift the ladder while on it. (Affidavit Kiska Report of October 17, 2008 pp. 2, 3, 7-8).

At the time of the climbing demonstration, by not moving his feet and merely shifting his weight on the fourth (highest allowable) step the ladder racked or walked on Mr. Kiska, becoming unstable. (Exhibit G Climbing Demonstration).

The climbing demonstration performed by Mr. Kiska illustrates that: (1) The Davidson Model D-2316-06S will walk while undergoing reasonable and foreseeable use; (2) The ladder will walk under substantially similar conditions as those that existed on April 12, 2007 (the date of Mr. Walker's injury); and (3) The ladder will walk and exhibit a tendency to tip over without Mr. Walker having pushed off the wall to cause the ladder to tip. (Affidavit Kiska paragraph 9).

LLI contends there is a conflict between Mr. Walker's testimony and Mr.

Kiska's demonstration. Mr. Kiska describes Mr. Walker's actions as follows:

*On the day of the accident, Mr. Walker was asked to conduct a search for hidden tobacco/drugs above a drop ceiling in a boys' bathroom contained within an "Alternative" classroom. His inspection occurred during a lunch break, during which time only he and the teacher (Jessica Hudgins) were present in the room. Ms. Hudgins stood in the doorway of the bathroom and held the door open, while Mr. Walker opened and positioned the ladder and ascended to the third step. From here he removed a ceiling tile, slid it over top of an adjacent tile in the ceiling, then climbed one more step and conducted his inspection using a small flashlight that had been in his hip pocket. After a few minutes on the ladder and having finished looking over one portion of the ceiling area, it was his intent to step down, move the ladder to a different position and inspect the other portion above the ceiling. With the flashlight in his left hand and his right hand still on the wall, Mr. Walker was starting to come down. While moving his right hand from the wall to the top cap he sensed the ladder move and twist, and instinctively grabbed back to the wall in an attempt to steady himself. As the ladder fell to the left toward the fixtures, he fell against the wall behind him and then to the floor onto his head and shoulder, sustaining severe personal injury.*

*As a person not particularly comfortable on ladders, Mr. Walker exercised exceptional care whenever faced with using one. At the time of the accident, he was using this ladder in accordance with the instructions, in that he:*
- *Made sure the ladder was fully opened and the spreaders were locked,*
- *Set all four feet on a firm level surface,*
- *Made sure spreaders were locked and ladder was stable before climbing,*
- *Faced ladder as he climbed, using both hands to maintain a firm grip,*
- *Kept his body centered between the side rails,*
- *Did not overreach,*
- *Did not climb higher than permitted,*

- *Was not pushing or pulling off to the side of the ladder, and*
- *Did not intentionally walk or shift the ladder while on it.* (Affidavit Kiska, Report October 17, 2008, pp. 2, 7-8).

LLI claims Mr. Walker's description of his injury is inconsistent and conflicting.  However, Mr. Walker clearly describes the event as having occurred as he was starting to descend and reached for the top cap of the ladder.

> A.     *Well, Jessica come and told me she thought some of the kids had tobacco or dope or something hid in the ceiling.  There was too much activity going on in the bathroom.  She asked me if I would come up there and look and see.  I told her, yeah, I said now that they are down there at the lunch room eating lunch and nobody in there.  I said you will be there, ain't you.  She said yeah.  So I just got the ladder and we walked up the hall together.*
>
> *The bathroom doors are on automatic shutters.  Well, she was standing there holding the door for me.  I just set the ladder up and climbed up there and pushed one of the ceiling tiles up and slid it over.  I had a little plastic flashlight, one of those little two cell battery lights.  I stuck my head up through the ceiling and shined the light.  I was just fixing to start down, and I felt the ladder move.  I thought oh Lord this is going to be bad.  I reached to try to put my hand on top of it where I could get down.  It was just like that made it get faster.* (Exhibit B, Deposition Larry Walker pp. 70-72).
> **********************************************************

> A.     *Approximately I believe that I was.  When I felt the ladder move, I tried to get this hand here on top up here, and I never did make it.*
> Q.     *Where were your hands at the moment that you first felt some movement in the ladder?*
> A.     *One was holding against the wall, and the other one holding the flashlight.  And when it moved I started to get this, but it was done too late.*
> Q.     *Your right hand was against the wall to your right?*
> A.     *Yeah.  This hand—I can't get this one up that high.  But anyway, I tried to reach down with this hand.*
> Q.     *Your left hand?*

14

A.    Yeah, my left hand to balance.

Q.    In the moment that you first felt the ladder move, your right hand was against the wall to your right, correct?

A.    Yeah.

Q.    And your left hand was holding the flashlight?

A.    Yeah.

*******************************************************

A.    No. I had my hand against the wall.

Q.    The whole time you were looking you had your hand against the wall?

A.    Until I turned my head, and then I—when I got ready to come down, then I put my hand on it. And that's when it all broke loose. That's when the ladder moved.

Q.    I'm a little confused. Let me make sure I understand. While you are inspecting with the flashlight in your left hand, do you have your right hand on top of the ladder, against the wall, on the ceiling, or where is your right hand while you're inspecting with your left?

A.    Well, at one point it was on the wall. And then next I put it up here. And then when I felt the ladder move, I grabbed the wall. I still had the flashlight. I turned it loose, and then that's when it—I tried to get this hand up here on that, but I didn't make it until it done had me in the floor.

Q.    So it was some sense of movement in the ladder that prompted you to put your right hand against the wall?

A.    Yeah.

Q.    As if to brace yourself?

A.    Yeah, to hold myself steady.

Q.    Was it a slight movement of the ladder that caused you to do that, or was it a great, big movement?

A.    Well, the ladder moved and then that's when I grabbed the wall. (Exhibit B, Deposition Larry Walker pp. 102-107; Exhibit F, Excerpt of deposition video Larry Walker).

Mr. Walker's description of what occurred has been consistent. He set the

ladder up, he climbed the ladder steps one step at a time, he removed the ceiling

tile and slid it over, he stepped up one step higher to look in the ceiling, he started

down by moving his right hand from the wall to put it on the top cap and the ladder moved. This is the scenario that Mr. Kiska has used in his climbing demonstration and in stating his opinion. There is no conflict in this basic description of the injury.

However, even if there were conflicts in Mr. Walker's testimony, the mere fact there is more than one possible cause of an injury does not mean an expert's opinion is inadmissible. Expert testimony does not have to eliminate all other possible causes of injury to be admissible. *Jahn v. Equine Services PSC*, 233 F.3d 382 (6th Cir. 2000).

In *Jahn*, the owner of a champion pony brought suit following the death of the pony after surgery. Jahn's two experts were prepared to testify that surgery should not have been performed because the pony had an infection which should have caused the treating doctor to call off the surgery. One of the experts was of the opinion that the pony went into shock after surgery, fell and hit his head and died due to hemorrhaging in his brain and spinal cord. Neither of Jahn's experts could identify a specific physiological cause of the pony's death. The District Judge granted Summary Judgment in Equine Service's favor after ruling sua sponte that the testimony of Jahn's two experts was inadmissible and therefore Jahn could not prove causation. The Sixth Circuit reversed pointing out that Jahn's experts' testimony does not have to eliminate all other possible causes of

injury in order to be admissible.  The District Judge erred in weighing the credibility of the pathologist report against the experts for Jahn, and thus invaded the province of the jury.

Mr. Walker's testimony is consistent; but even if there were differing versions of the facts, an expert's opinion should not be excluded on the ground that the court believes one version of the facts and not the other.  Proponents of expert testimony "do not have to demonstrate to the Judge that the assessment of their experts is correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." *In Re: Paoli Yard PCB Litigation*, 35 F.3d 717, at 744 (3rd Cir. 1994).

*Daubert* and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts of the case at hand, not that they know answers to all the questions a case presents—even to the most fundamental question. *Jahn*, at 390.

- ▪ **Mr. Kiska's tests**

As part of Mr. Kiska's work he has also performed a series of tests on the same model ladder and has compared the result of those tests to other ladders. The test that Mr. Kiska performed is designed to closely mimic the circumstances of actual use conditions.  The results of Mr. Kiska's tests are quantifiable and can

be replicated. His test is rooted in the ANSI racking test, but Mr. Kiska's test is meant to better quantify how resistance to twisting equates to resistance to walking. Mr. Kiska explains his protocol in his report and in addition has provided a DVD with the results of his test to LLI. (Exhibit A, Affidavit Kiska paragraph 7; Report October 27, 2008 pp. 4-6; Exhibit H, DVD of Kiska testing).

The Plaintiffs need not prove that the expert is undisputedly correct or that the expert's theory is "generally accepted" in the scientific community. Instead, the Plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements. *Bitler v. A.O. Smith Corporation*, 400 F.3d 1227 (10th Cir. 2005). Here, Mr. Kiska has not only employed the standard method of accident investigation, he has gone further and tested the same model product using a testing method which can be replicated, to illustrate his theory that the ladder in question has a tendency to walk. The phenomenon the test is meant to illustrate and quantify, that stepladders will unintentionally walk, is not disputed. In fact, this phenomenon was acknowledged in the rationale to ANSI A14.2 7.5.10 (ANSI racking test) and in the "Fox" study performed in 1977. It is beyond dispute that the ladder in question will walk. Mr. Kiska's test is an attempt to <u>quantify</u> that phenomenon in this ladder. In fact, Mr. Kiska's tests have shown that the model ladder in this

case, the Davidson D-2316-06S, is the "flimsiest of any conventional 6-foot aluminum stepladder" he has tested. (Exhibit A, Affidavit Kiska paragraph 8). Mr. Kiska's test produces objective quantifiable data, his method of testing is capable of being duplicated and it is based in large part on an existing ANSI test.

If the Court limits evidence of the testing of products to those tests currently adopted as the consensus in the industry, the industry would be allowed to set its own standard. See, *Stagl v. Delta Airlines, Inc.*, 117 F.3d 76 (2nd Cir. 1997). It is always necessary to remember that it is the Judge and the jury who decides what is reasonable. It is not for the industry to decide what is reasonable. "In most cases reasonable prudence is in fact common prudence; but strictly never its measure." *The T.J. Hooper*, 60 F.2d 737, 740 (2nd Cir. 1932). Whether there is a design defect cannot be determined by reference to the manufacturer's own design or marketing standards because those standards are the very ones that plaintiffs attack as unreasonable. Restatement Third Torts: Products Liability § 2 Comment a. LLI may very well argue to the jury that the ANSI racking test adopted in 1983 (and never modified) is the state of the art in 2007, but Mr. Walker should be able to introduce proof that the ANSI test does not test what it should and to offer proof of an alternate testing method which does.

The tests performed by Mr. Kiska and the videotape demonstration of those tests are meant to illustrate the principles at work when a stepladder walks. These

tests are not necessarily meant to be a recreation of the events of Mr. Walker's injury. Demonstrations of experiments used in forming an expert opinion are not always required to adhere strictly to the circumstances of the event at issue in the trial to be admissible. *Robinson v. Audi NSU Auto Union Aktiengesellschaft*, 739 F.2d 1481 (10th Cir. 1984). *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408 (3rd Cir. 2002). Mr. Kiska's walking tests are meant to illustrate the tendency of a ladder to walk under foreseeable use conditions. (Exhibit A, Kiska Affidavit paragraph 7).

## IV.   CONCLUSION

Mr. Kiska's qualifications to render helpful testimony are not disputed. The video evidence he proposes to use at trial is helpful to the trier of fact. The proposed evidence is both relevant and reliable. Mr. Kiska's testimony is based upon sufficient facts and data. The testimony is the product of reliable principles and methods which have been applied to the facts of the case. For these reasons, Larry and Cynthia Walker respectfully request the Court deny LLI's Motion to Exclude this helpful evidence.

Respectfully submitted this the 10th December, 2008.

s/ W. Holt Smith
W. HOLT SMITH, BPR NO. 004557,
Attorney for Plaintiffs,
209 Tellico Street, North
Madisonville, Tennessee 37354
Phone: (423) 442-4012

s/ J. Timothy Bobo by permission
J. TIMOTHY BOBO, BPR NO. 017263,
Attorney for Plaintiffs,
108 South Main Street
P.O. Box 530
Clinton, Tennessee 37717-0530
Phone: (865) 457-0755

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 10th day of December, 2008 a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties listed below. Parties may access this filing through the Court's electronic filing system.

John L. Tate
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, Kentucky  40202-3352
Phone: (502) 587-3400

Lauren Paxton Roberts
STITES & HARBISON, PLLC
424 Church Street, Suite 1800
Nashville, Tennessee  37219-2376
Phone: (615) 244-5200

s/ W. Holt Smith
W. HOLT SMITH